MOSS *v.* KEARY.

1. MORTGAGES—FORECLOSURE BY ADVERTISEMENT—STATUTORY PROVISIONS MUST BE COMPLIED WITH.

The foreclosure of a mortgage by advertisement is an *ex parte*, nonjudicial proceeding, based on contract, and authorized by the mortgagor; and, while it should not be hampered by unreasonable construction of the statute

(3 Comp. Laws 1915, § 14949 *et seq.*), all of its essential provisions must be complied with.[1]

2. SAME—PERSONAL NOTICE NOT REQUIRED.
    In such proceedings, no personal notice is required under power of sale either at common law or by statute.[2]

3. SAME—NOTICE BY PUBLICATION—SUFFICIENCY.
    Under 3 Comp. Laws 1915, § 14951, a notice of foreclosure by advertisement, legal in form, published for the statutory period in a village weekly paper having a small circulation but located in the county, and being the official paper of the village and in which circuit judges had ordered the publication of other legal notices, is a valid and legal notice.[3]

4. SAME—FORECLOSURE—FRAUDULENT CONDUCT NOT ESTABLISHED.
    The action of the mortgagees in promptly foreclosing a second mortgage after plaintiffs had ignored and failed to meet instalments when due, can not be said to evidence fraudulent or unfair conduct on the part of the mortgagees.[4]

5. SAME—FORECLOSURE SALE—INADEQUACY OF PRICE INSUFFICIENT TO SET ASIDE OTHERWISE VALID SALE.
    Under proceedings for the statutory foreclosure of a mortgage by advertisement, mere inadequacy of price is not in itself sufficient ground for setting aside an otherwise legal sale.[5]

6. SAME—FORECLOSURE—FRAUD—BURDEN OF PROOF.
    Where such sale was fair on its face, with all statutory requirements fully complied with, plaintiffs in a suit to set aside such foreclosure on the ground of fraudulent and unfair conduct, have the burden of proof to establish the invalidity thereof.[6]

7. SAME—FRAUD NOT SUSTAINED BY PROOFS.
    Where, in such proceedings, plaintiffs had actual notice of the foreclosure sale and ample time to redeem therefrom before the period of redemption expired, and they have not sustained their charge of fraud and irregularity, a decree dismissing the bill was justified.[7]

Appeal from Wayne; Hart (Ray), J., presiding.

[1]Mortgages, 27 Cyc. pp. 1449, 1450; [2]Id., 27 Cyc. p. 1470; [3]Id., 27 Cyc. p. 1473; [4]Id., 27 Cyc. p. 1510; [5]Id., 27 Cyc. p. 1507; [6]Id., 27 Cyc. p. 1510; [7]Id., 27 Cyc. p. 1510.

Submitted December 2, 1924. (Docket No. 43.) Decided June 18, 1925. Rehearing denied October 1, 1925.

Bill by Jacob Moss and another against Andrew J. Keary and another to set aside a statutory foreclosure of a mortgage. Charles H. Culver intervened as a party defendant. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*Lloyd L. Axford* and *William E. Tarsney,* for plaintiffs.

*Elmer H. Groefsema,* for defendants.

*Charles H. Culver, in pro. per.*

STEERE, J. This bill was filed to obtain relief from a statutory foreclosure of a mortgage on a house and lot located in Bradford Smith's subdivision of the west part of private claim 729 in the city of Detroit, Michigan. The property in question had belonged to one Earl L. Thompson, who mortgaged it for $3,200 on October 8, 1920, to the Wayne County and Home Savings Bank of Detroit, which was duly recorded the next day. On June 18, 1921, he obtained a loan of $600 from defendants Keary, through a real estate and loan broker of Detroit named Ebert, giving them a second mortgage on said land to secure the same, which was recorded five days later. On September 24, 1921, Thompson conveyed the property to plaintiff Jacob Moss and one Arnor Rubach by warranty deed subject to the two mortgages above mentioned which the grantees assumed and agreed to pay. Said deed was duly recorded. On October 31, 1921, Rubach and wife conveyed their interest in said property to plaintiffs, Jacob and Lena Moss, subject to said mortgages, which the latter assumed and agreed to pay. Some payments were made and the interest kept up on the first mortgage to the bank but no payments were made upon the second mortgage held by defend-

ants.    This mortgage called for monthly payments of not less than $60 per month, the entire principal with interest to be paid in full by February 18, 1922. It expressly provided:

"That should default be made in the payment of any instalment of principal maturing hereon, before the whole thereof becomes due, or of any instalment of interest when the same becomes due and payable, or of any taxes or assessments or premium for insurance, or any part thereof, when the same are payable as above provided, and should the same or any part thereof remain unpaid for the period of thirty days, then and from thenceforth, the aforesaid principal sum, with all arrearages of interest, shall at the option of said mortgagees, their legal representatives, or assigns, become due and be payable therefrom and thereafter although the period above limited for the payment of the same shall not then have expired, anything hereinbefore, or in said notes contained to the contrary thereof in any wise notwithstanding."

In which case the mortgagees are authorized to declare the whole amount due upon said mortgage and proceed to enforce the same.    In case of foreclosure $35 attorney fee is provided.

Over a month before plaintiffs acquired title to this property, in whole or in part, this second mortgage for $600 was in default, defendants had declared the whole amount due and begun statutory foreclosure proceedings by advertisement in the Springwells Tribune, a paper printed and published in Wayne county.    After acquiring full record title to the property, subject to the two mortgages, plaintiffs sold it under a land contract dated November 10, 1921, to a man named Oliver, the consideration named in the contract being $10,300.    The terms of payment and amount paid down are not shown, neither does it appear that this contract was ever recorded.

The mortgage contained the usual power of sale authorizing foreclosure by advertisement.    Such fore-

closure is an *ex parte* non-judicial proceeding, based on contract and authorized by the mortgagor. While it should not be hampered by unreasonably strict construction of the act (*Lee* v. *Clary*, 38 Mich. 223), all essential provisions of the act must be complied with (*Pierce* v. *Grimley*, 77 Mich. 273). No personal notice is required under power of sale at common law or by the statute. The statutory requirements for foreclosure appear to have been regularly observed in proper time and manner. Public auction pursuant to foreclosure notice published for the statutory period in Springwells Tribune was held on November 22, 1921, by the sheriff of Wayne county, at the time and place specified, and the property was sold by him to defendants, they being the highest bidders. Following the close of the sale the sheriff promptly executed a deed of the property to them as the act authorizes (3 Comp. Laws 1915, § 14957), which was duly recorded and left in the custody of the register of deeds of Wayne county, where it remained until the period of redemption expired, on November 23, 1922, when it was delivered to defendants.

Aside from the contention that the Springwells Tribune was not such a paper printed, circulated and published in the county within which the property is located as contemplated by the statute, it is practically conceded for plaintiffs that the strict letter of the law was followed in this statutory foreclosure. The claim and theory urged in their behalf as condensed from their bill is in substance that defendants as mortgagees violated the trust obligations which the law imposes on them as such, conceived and executed a plan to suppress or conceal as far as possible any notice to the mortgagor and others having an interest in the proceeding that they might, as they did, secure the property for themselves, and to that end both refrained from giving any notice to the mortgagor and made their statutory publication in a small and obscure

paper printed in the village of Springwells, outside of Detroit.

Plaintiffs' testimony in support of their contention that the newspaper in which publication was had was not such as required by the statute showed that the Springwells Tribune was a paper scarcely two years old at that time, published in the little village of Springwells, with a circulation of scarcely 400, little known in the city of Detroit and the youngest newspaper in Wayne county carrying legal notices. It was shown by defendants' testimony to be the official paper of the village, that it was patronized for publication of legal notices by various attorneys of Detroit, several of the circuit judges of Wayne county had issued orders for publication of legal notices in it, that it was distributed to various law offices in Detroit and its circulation was about equal to that of the Detroit Law Journal and the Belleville Enterprise, both of which have been held to meet statutory requirements. Copies of the two village papers were made exhibits in the case, that of the Belleville Enterprise containing a copy of the notice held legal in *Lau* v. *Scribner*, 197 Mich. 414, and that of the Springwells Tribune a copy of the notice in this case.

The statute (3 Comp. Laws 1915, § 14951) requires the notice of foreclosure of mortgages by advertisement to be given by publishing the same for twelve consecutive weeks, at least once in each week, in a newspaper printed in the county where the premises included in the mortgage and intended to be sold are situated. A proper notice legal in form was published for that period in the Springwells Tribune. This case is controlled, so far as involves the validity of the notice, by *Lau* v. *Scribner*, 197 Mich. 414, the paper there in question being the Belleville Enterprise. *Vide*, also, *Hoock* v. *Sloman*, 155 Mich. 1, where publication of notice of sale in the Detroit Law Journal was held valid.

Counsel for plaintiffs dwell at length on the prompt action taken to foreclose and inadequacy of price for which the property was sold on foreclosure sale as evidence of fraudulent conduct on the part of defendants and their agent, Ebert, the real estate and loan broker through whom Thompson procured the money to secure payment of which this second mortgage was given. It was a comparatively short time loan to be paid in monthly instalments of not less than $60 secured by a second mortgage on a house and lot, putting upon them the necessity of paying the first mortgage of $3,200, if the mortgagor failed to meet it, in order to protect their loan. Under such circumstances, prompt action to enforce payment of such instalments after the borrower had ignored and failed to meet them as they fell due can scarcely be counted as evidence of fraudulent or unfair conduct on the part of the creditor.

The evidence indicates inadequacy of price, just how much is not altogether clear. What Moss and Rubach paid Thompson for the twice mortgaged property which he deeded to them after the foreclosure was begun is not shown. About a month after Rubach received his deed from Thompson he deeded his interest in the property to Moss and wife, in what way he was paid for his half, or how much, is not shown. Moss testified the property cost him $9,000 and he later sold it to Oliver for $10,300 under a land contract the terms of which are not shown, neither is Oliver made a party in this suit. But conceding inadequacy of price as claimed, mere inadequacy is not in itself sufficient ground for setting aside an otherwise legal sale. In the early case of *Campau* v. *Godfrey,* 18 Mich. 27, it was said by this court, speaking through Justice Christiancy:

"And no case has been cited, nor are we aware of any, in which an execution sale of real estate has been set aside, on motion or otherwise, for inadequacy

of price alone, especially when, as in this case, it was subject to a year's redemption. The statute giving a year's redemption seems to rest mainly upon the idea that real estate may be sold for less than its value, and to give the time of redemption mainly on this ground. This is an adequate remedy, and if the debtor will not avail himself of it, he can not complain of it. Public policy requires that judicial sales which have been open and fair, and nothing done to prevent a sale at a higher price, should not be disturbed on the ground of inadequacy; since the effect of an opposite course would be to deter bidders, and render the prices on such sales still less. And any rule which might be laid down as to the degree of inadequacy would be wholly arbitrary;" citing decisions.

In *Cameron* v. *Adams,* 31 Mich. 426, a case presenting special features of hardship much more severe than any claimed here, it is said in an opinion by Justice CAMPBELL:

"If the sale had been made under the decree of a court, the authorities cited on the argument would bear very strongly in favor of relieving complainant. Courts of equity have large powers for relief against the consequences of inevitable accident in private dealings, and may doubtless control their own process and decrees to that end. But we think there is no such power to relieve against statutory forfeitures. Where a valid legislative act has determined the conditions on which rights shall vest or be forfeited, and there has been no fraud in conducting the legal measures, no court can interpose conditions or qualifications in violation of the statute. The parties have a right to stand upon the terms of the law. This principle has not been open to controversy, and is familiar and elementary. The inadequacy of price cannot vitiate such a sale, if otherwise fair and regular. The owner of the right of redemption can always redeem within the year by refunding the amount paid, with interest at the rate fixed by the statute. It is only his failure to do this which has been the cause of his loss."

*Vide,* also, *Blackwood* v. *Sakwinski,* 221 Mich. 464.

Plaintiff's last and most elaborately briefed contention is based on the proposition, as stated in 3 Jones on Mortgages, § 1906:

"A mortgagee or trustee, in the exercise of a power of sale, must act fairly and is under very much the same obligation to other parties in interest as a trustee in other cases. So far as other persons are interested in the property, the power is regarded as a trust, and the mortgagee is treated as a trustee in the exercise of it. Fairness and good faith are demanded of him."

To what extent such trust obligations of a bare mortgagee carry to purchasers of the mortgaged property after foreclosure proceedings have been commenced is open to question. The right of statutory foreclosure under a power of sale is based upon a contract between the mortgagor and mortgagee. Plaintiffs were under no contractual relations with defendants at any time. They owed them nothing. The debt secured by this mortgage was Thompson's, for money he borrowed from defendants evidenced by instalment notes, as to which he was in default before he sold the property. The statute does not even require the mortgagee to give notice, other than by publication. If it did, there is no proof Thompson was not notified. The burden of proof is on plaintiffs to show the invalidity of the foreclosure. The burden of proof rested upon plaintiffs to satisfactorily prove by a preponderance of evidence the unfair and fraudulent conduct of which they complain, in order to nullify this statutory foreclosure, which is fair on its face with all statutory requirements fully complied with. The infirmity of plaintiffs' claim is in the major premise of facts upon which their counsel's able argument is based.

When these foreclosure proceedings were begun Thompson, the mortgagor, owned this property, was the only party, except the first mortgagee, shown to

have any interest in it, or known to defendants in the transaction. Moss testified that he and Rubach had negotiated with Thompson for the property before that time but makes no claim that fact was, or they were, known by defendants until near the time the period of redemption would expire. They acquired Thompson's interest in the property a month after foreclosure proceedings were begun and did not give defendants notice of their subsequently acquired interest, personally or by mail, and remained total strangers to them. Moss testified that in October, 1921, when he received his deed from Rubach of the latter's interest in the property he looked at it and "saw that Mr. and Mrs. Keary had a second mortgage on the property." He further said he did not ask Thompson or Rubach or any one else whether any interest or principal had been paid on it because he understood from Rubach that it was a two years mortgage, and did not go or send any one to the register of deeds' office to find out about it. He did tell the bank which held the first mortgage of his interest in the property but did not inform defendants because he "could not locate them." Asked why he didn't write them he replied, "To be honest with you, I waited for notice, the same as every business man." Moss was himself in the real estate business. He admitted that he was in that line of business and had bought and sold real estate but said it was "on the side," and his business was that of a painter and decorator; but acknowledged as his, a card announcing he was "in the real estate business." As a real estate man he knew, or is presumed to have known, that he could learn the terms of this mortgage in the register of deeds' office where it was recorded, and that interest would be due on it at least once a year. He tells of learning from a man he knew that Keary was a money lender who had two homes, one on Avalon avenue and one some place out of town,

and the nearest he came to getting in touch with defendants until he learned the mortgage was foreclosed was to get Keary's 'phone number and call up his home.    When told he was not at home he gave his own address and telephone number to the woman who answered.    On cross-examination he was asked and answered of this in part as follows:

"*Q*. How did they (defendants) know you owned it?

"*A*. I left word; my telephone number there with the lady and the street address.

"*Q*. And that is all you did?

"*A*. That is all I did.

"*Q*. And that is the only explanation now that you have to offer for this statement, that you expected Mr. or Mrs. Keary to send you a notice that this foreclosure was due.

"*A*. Anyway, I did not, because I left my street number and telephone number.

"*Q*. With the party?

"*A*. Yes.

"*Q*. And that is all you did?

"*A*. That is about all that I could have done."

The property in question was occupied by tenants. Moss stated on direct-examination that the first knowledge he had of the foreclosure was November 20, 1922, when Oliver told him that the rent had been stopped.    On cross-examination he said:

"I was unable to get in touch with Mr. and Mrs. Keary until after the mortgage foreclosure had expired.    That is true.

"*Q*. After this mortgage had expired you did succeed in getting in touch with Mrs. Keary by telephone?

"*A*. I was trying to 'phone her.

"*Q*. Afterwards you did?

"*A*. I was trying to call her before that.    I did not get an answer.    Once I did get a lady's answer, but they was out.

"*Q*. Nobody home?

"*A*. Yes, I never went out to the place there at their residence."

Moss testified that after he learned of the foreclosure, when Oliver told him that somebody had been to the property "stopping the rent," he "went up and tried, the first time I got in it was with Mrs. Keary," and she told him that she had nothing to do with the matter, as Mr. Ebert was handling it.    He then got in touch with Mr. Ebert and talked with him about the foreclosure, offered to pay up the mortgage and all expenses, and was answered, "I will get in touch with Mr. Keary."    The next time Moss went back to Ebert he said, "I don't know."    Moss tells of seeing the Kearys thereafter and various interviews he had with them and Ebert in which he said the latter "kept stalling along for about ten days."    Some of their interviews were apparently not altogether pleasant as Moss tells that later they "got to talking in a nice way."    Of an interview before that time he testified that in reply to his reflections as to his not being notified Ebert said, "We are not supposed to do that.    We are just waiting for you to get in a trap, somebody got me in a trap and I got you in a trap."    This is particularly emphasized as glaring evidence of defendants' iniquitous, unfair and fraudulent plan to acquire the mortgaged property by a surreptitious foreclosure.

As Moss says he did not get in touch with Mr. or Mrs. Keary until the time to redeem had expired, nor with Ebert until after he saw Mrs. Keary, the materiality of those *ex post facto* interviews seems questionable.    No claim is made of unkindly replies or declaration of sinister purpose by defendants themselves.    Just what provocation Ebert had for his ungracious retort is not very clear.    It may be conceded as indicating that he was not burdened with bowels of compassion, but does not impress us as a test of the validity of this foreclosure.    The record shows that an attorney named S. R. Smith conducted the foreclosure proceedings for defendants.    They

were carried through with careful observance of all conditions and requirements of the statute.

His own testimony shows that Moss learned of the foreclosure two full days before the period of redemption expired. The fact that information came to him from notice to the tenants to stop paying rent some time before it had expired, is not in harmony with the theory that defendants were scheming to prevent plaintiffs getting notice of the foreclosure in time to redeem. At any time during the two days after Moss had actual notice he could have held himself harmless and rendered the sheriff's deed on foreclosure void by stepping into the register of deeds' office and depositing with him the amount the property was bid in for, with interest and a fee of one dollar for the register. As said in the *Cameron Case,* "It is only his failure to do this which has been the cause of his loss."

While the various cases cited by plaintiffs' counsel maintain in the main the principles they contend for, a careful examination of the controlling facts on which they turned shows them so far from analogous to those disclosed in the instant case that we do not find them controlling here nor deem it essential to review them at length. Plaintiffs have not sustained their charge of fraud and irregularity in this statutory foreclosure. It was strictly in compliance with statutory requirements, and, in legal contemplation, fair and regular. Courts of equity cannot impose additional conditions to relieve against statutory forfeiture. Plaintiffs had notice before the period of redemption expired and ample time to redeem.

The decree of the lower court dismissing plaintiffs' bill will stand affirmed, with costs to defendants.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.